JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Anthony Kushlan, appeals the decision of the lower court. Having reviewed the arguments of the parties and the pertinent law, we hereby affirm the lower court.
 {¶ 2} According to the case, appellant was charged in a seven-count indictment. Appellant was charged with the following counts: Count 1, the rape of M.S., in violation of R.C. 2907.02(A)(2); Count 2, the kidnaping of M.S., in violation of R.C. 2905.01(A)(2); Count 3, the attempted rape of M.S., in violation of R.C. 2907.02(A)(2); Count 4, sexual imposition, in relation to M.S., in violation of R.C. 2907.05(A)(1); Count 5, the rape of N.A., in violation of R.C. 2907.02(A)(2); Count 6, gross sexual imposition in relation to N.A. in violation of R.C. 2907.05(A)(1); Count 7, the kidnaping of N.A. in violation of R.C. 2905.01(A)(2). At the time of the crimes, both victims were minors.
 {¶ 3} A jury trial was had on this matter beginning on February 19, 2008. The trial court granted Kushlan's Criminal Rule 29 motion to dismiss with regard to counts two, five, six and seven of the indictment: leaving the jury to consider counts of rape, attempted rape, and gross sexual imposition against Kushlan in connection with M.S.
 {¶ 4} On February 26, 2008, the jury returned a verdict of not guilty with respect to count one of rape and count three of attempted rape. The jury returned a verdict of guilty with respect to count four, the gross sexual imposition charge as related to minor M.S. On March 31, 2008, the trial court sentenced appellant Kushlan *Page 4 
to a 17-month prison term, along with five years of postrelease control. Appellant now appeals.
 {¶ 5} According to the facts, M.S. testified that on June 19, 2007, she went to a movie at approximately 7:30 p.m. with her friend N.A. and two other friends. M.S. was 15 years old at the time. After the movie, the four girls met up with their friend, A.S. at a Target store and hung around there for awhile. A.S. lived nearby so the girls decided to head over to A.S.'s house where she lives with her mom. Upon arriving at approximately 9:45 p.m., they met A.S.'s mom, Mary Pat, her mom's boyfriend, Chuck, A.S.'s brother Mike and appellant.
 {¶ 6} At one point, the girls decided they were all going to sleep over A.S.'s house. After spending some time in the house, the girls eventually decided to go outside to the front porch. A.S.'s brother and appellant had already left to go to a bar. Later in the evening, after the girls waited for the adults who were left at the house to go to sleep, they began to drink beer and vodka that was left behind from A.S.'s mom and Chuck. M.S. testified that she consumed approximately four beers and a couple of vodka drinks.
 {¶ 7} The girls continued to drink for about an hour and a half until they were joined by Mike and appellant returning from the bar. All of them continued to drink together until the early morning hours of June 20, 2007. They talked about what high school the girls attended and how old they were, with appellant specifically commenting on how good they looked for their ages. *Page 5 
 {¶ 8} Eventually they all decided to go to bed. One of M.S.'s friend had already passed out on the floor in front of a couch in the living room downstairs. M.S. went upstairs with Mike and her other friend, figuring everyone else stayed downstairs because it was cooler. Later, N.A. also came upstairs and crowded into bed with the others. M.S. got up to use the bathroom downstairs and found another place to sleep behind the living room couch where N.A. had already set up blankets before going upstairs.
 {¶ 9} M.S. laid down behind the couch and began to fall asleep when she felt someone lay down behind her. M.S. was wearing sweatpants and a T-shirt and was under a blanket. Later, in a semi-conscious state, she turned to look at who was behind her and saw that it was appellant. M.S. scooted over to give him more room. Appellant covered her up with his blanket and then placed his hand on her hips and butt. When she felt appellant's hand, she immediately turned around and looked at him in disbelief. Appellant then tried to kiss her, saying that she was sexy and that he wanted her.
 {¶ 10} Appellant then pulled down her sweatpants and tried to get his hand inside her underwear, rolling her over on her back for a better position. M.S., feeling embarrassed and ashamed, whispered to appellant "no, please stop."[1] Appellant continued, successfully getting his hand in her underwear, rubbing her vaginal area, and finally digitally penetrating her. Appellant then unbuttoned his pants and tried to *Page 6 
put her hand on his penis, but she pulled it away. Appellant then became more aggressive, holding her down in order to have sexual intercourse. M.S. specified that his pants were at his knees and he held his arm across her chest to hold her down while using his other hand to position himself.
 {¶ 11} A.S., who was asleep on the couch said that she heard noises coming from behind the couch and heard appellant urging M.S. to go outside with him. A.S. got up when she saw appellant on his side against M.S. with M.S. on her back with her legs open under a blanket. A.S. ran upstairs and told her brother who promptly ran downstairs. Within thirty seconds, Mike confronted appellant, who pretended to be asleep. The confrontation escalated to the point where Mike physically removed appellant from the home and everyone else in the house was awakened. At that time, M.S. told no one what had actually happened behind the couch due to her embarrassment and shame.
 {¶ 12} M.S. got a ride home from A.S.'s mother and arrived home at approximately 6:00 a.m. Later that same day, M.S. received a call from N.A. In this call, N.A. described a similar experience that she had with appellant, and M.S. then told N.A. what happened to her. Later that day, N.A. told her therapist what happened to her as well as what happened to M.S. The therapist contacted Children's Services and Mayfield police. That evening, M.S. told her mother what had occurred and was immediately taken to Hillcrest Hospital where she had a sexual assault examination performed. After the hospital visit, M.S. reported the incident to the police. *Page 7 
 {¶ 13} N.A. had a similar experience with appellant just prior to the sexual assault upon M.S. She testified that after the movie, she and her friends went to A.S.'s house and consumed a large amount of alcohol. The girls were later joined by A.S.'s brother Mike and appellant, and continued drinking with them until approximately 2:00 a.m.
 {¶ 14} When everyone decided to go to bed, N.A. laid down behind the couch while the others went upstairs. At some point she got up to use the bathroom and returned to the couch to find appellant there. She pushed him out of the way and laid back down when appellant began touching her first on the knee and butt. Then he moved his hand into the side of her shorts and digitally penetrated her. Just as he did with M.S., appellant urged N.A. to go outside. When appellant stepped out to have a cigarette, N.A. got up and went upstairs to sleep with her friends and told no one what had just transpired. When N.A. went upstairs, that was when M.S. was on her way downstairs. A short time later, A.S. came upstairs to tell her brother what appellant was doing with M.S. A.S.'s brother Mike then angrily removed appellant from the home. N.A. was driven home by A.S.'s mother at 6:00 am and told her therapist the events of the previous evening a day later.
 {¶ 15} Kushlan assigns two assignments of error on appeal:
 {¶ 16} [1.] "Appellant's conviction for gross sexual imposition should be reversed because the trial court's findings were against the manifest weight of the evidence." *Page 8 
 {¶ 17} [2.] "The trial court committed prejudicial error in sentencing appellant to a 17 month prison term in contravention of the overriding purposes of felony sentencing."
 {¶ 18} Appellant argues that his conviction for gross sexual imposition should be reversed because the trial court's findings were against the manifest weight of the evidence. Although, appellant mentions only manifest weight in his first assignment of error, he combines both manifest weight and sufficiency of the evidence claims in his argument. Therefore, for the sake of consistency and thoroughness, we address both manifest weight and sufficiency in our review.
 {¶ 19} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. With respect to sufficiency of the evidence, sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law. In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.
 {¶ 20} Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may, nevertheless, conclude that the judgment is against the weight of the evidence. Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support *Page 9 
one side of the issue rather than the other. It indicates clearly to the jurors that the party having the burden of proof will be entitled to a jury verdict, if, on weighing the evidence in their minds, their verdict shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id.
 {¶ 21} As to a claim that a judgment is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. State v. Martin (1983),20 Ohio App.3d 172, 20 Ohio B. 215, 485 N.E.2d 717. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.
 {¶ 22} Kushlan was convicted of gross sexual imposition in violation of R.C. 2907.05. Specifically, R.C. 2907.05(A)(1) defines the offense of gross sexual imposition as follows: "(A) No person shall have sexual contact with another, not the spouse of the offender *** when any of the following applies: (1) The offender *Page 10 
purposely compels the other person, or other persons, to submit by force or threat of force."
 {¶ 23} The term "force" is defined in R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." A defendant purposely compels his victim to submit by force or threat of force when he uses physical force against the victim, or creates the belief that physical force will be used if the victim does not submit. State v. Schaim (1992),65 Ohio St.3d 51, 55, 1992-Ohio-31, 600 N.E.2d 661.
 {¶ 24} Here, M.S. testified that the defendant touched and rubbed her vagina and digitally penetrated her with his fingers, despite her plea for him to stop.[2] From that testimony alone, a rational trier of fact could have found that the State established the element of force.
 {¶ 25} In addition, M.S. also testified that defendant physically pulled down her sweat pants and tried to get his hand inside her underwear before using force to roll her over on to her back for a better position.[3] Additional use of force is further established by M.S.'s testimony that Kushlan unbuttoned his pants and tried to put her hand on his penis, but she pulled it away. Specifically, M.S. testified that appellant "kept trying to grab my hand and like put it on his private area."[4] *Page 11 
 {¶ 26} Further testimony by M.S. demonstrates additional force on the part of Kushlan. M.S. testified that Kushlan "started like holding medown a little bit and like trying to, you know, have sex with me, and Ijust kept saying, "No," and I guess [A.S.] eventually heardus."[5] The use of force is further clarified when M.S. testifies in response to trial counsel's question: Q. "Okay. When you say he tried to have sex with you, what was he doing?" A. "He had his arm like across mychest like this, like holding me down, and is like using the other hand like to position himself."[6]
 {¶ 27} The evidence in the record clearly demonstrates Kushlan physically exerted himself on M.S. in order to commit this crime, thereby satisfying the element of force. We find that the evidence in the record clearly supports the "force" or "threat of force" element necessary for the gross sexual imposition conviction. Accordingly, the state presented sufficient evidence to support Kushlan's conviction. Furthermore, we find that the conviction was not against the manifest weight of the evidence and find no error on the part of the lower court.
 {¶ 28} Accordingly, Kushlan's first assignment of error is without merit.
 {¶ 29} Appellant Kushlan argues in his second assignment of error that the lower court committed prejudicial error in sentencing him to a 17-month prison term in contravention of the overriding purposes of felony sentencing. We do not find merit in appellant's argument. *Page 12 
 {¶ 30} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470, the Ohio Supreme Court, in striking down parts of Ohio's sentencing scheme, held that trial courts have full discretion to impose a prison sentence within the statutory range and are not required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences. Id. at paragraph seven of the syllabus.
 {¶ 31} Recently, in State v. Kalish, 120 Ohio St.3d 23,2008-Ohio-4912, 896 N.E.2d 124, in a divided decision, the Supreme Court set forth how appellate courts are to review felony sentences afterFoster. The court stated:
 "In applying Foster to the existing statutes, appellate courts must apply a two-step approach. First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision shall be reviewed under an abuse-of-discretion standard." Id. at ¶ 4.
 {¶ 32} The first prong of the analysis instructs that "the appellate court must ensure that the trial court has adhered to all applicable rules and statutes in imposing the sentence. As a purely legal question, this is subject to review only to determine whether it is clearly and convincingly contrary to law, the standard found in R.C. 2953.08(G)." Id. at ¶ 14.
 {¶ 33} The court explained that the applicable statutes to be applied by a trial court include the felony sentencing statutes R.C. 2929.11 and2929.12 because, unlike R.C. 2929.14, they are not fact-finding statutes. Id. at ¶ 17. Therefore, as part of its analysis of whether the sentence is "clearly and convincingly contrary to law," an *Page 13 
appellate court must ensure that the trial court considered the purposes and principles of R.C. 2929.11 and the factors listed in R.C. 2929.12.
 {¶ 34} Applying the first prong of the analysis, the Kalish court concluded that the trial court's sentence was not "clearly and convincingly contrary to law," because (1) the trial court "expressly stated that it considered the purposes and principles of R.C. 2929.11, as well as the factors listed in R.C. 2929.12," (2) it properly applied postrelease control, and (3) the sentence was within the permissible range. Id. at ¶ 18.
 {¶ 35} If the first prong is satisfied, that is, the sentence is not "clearly and convincingly contrary to law," the appellate court must then engage in the second prong of the analysis, which requires an appellate court to determine whether the trial court abused its discretion in selecting a sentence within the permissible statutory range. Id. at ¶ 17. The court explained the effect of R.C. 2929.11 and2929.12 in this regard:
 "R.C. 2929.11 and 2929.12 *** serve as an overarching guide for the trial judge to consider in fashioning an appropriate sentence. In considering these statutes in light of Foster, the trial court has full discretion to determine whether the sentence satisfies the overriding purpose of Ohio's sentencing structure. Moreover, R.C. 2929.12 explicitly permits trial courts to exercise their discretion in considering whether its sentence complies with the purposes of sentencing. It naturally follows, then, to review the actual term of imprisonment for an abuse of discretion." Kalish at ¶ 17.
 {¶ 36} In applying the second prong of the analysis, the Ohio Supreme Court noted that the trial court "gave careful and substantial deliberation to the relevant statutory considerations," and that "there is nothing in the record to suggest the trial court's decision was unreasonable, arbitrary, or unconscionable." Id. at ¶ 20. *Page 14 
 {¶ 37} In the case at bar, the lower court judge properly considered R.C. 2929.11 and 2929.12. The trial judge stated the following regarding his sentencing of Kushlan:
 "***, I have to apply the felony sentencing statute. The overall purpose is to punish the offender, and protect the public from future crime by the offender and others.
 "In doing my job, I'm given guidance in sentencing by Revised Code 2929.12. Under 2929.12(B), indicates your conduct is more serious, there was psychological harm to the victim. She's 15, she's had to resume counseling, and also note that, once a juvenile victim, this act exacerbated her mental or psychological issues that she already had, made it a lot worse.
 "She was credible, in my view, when she testified that she was disgusted by the fact that someone the age of her uncle was touching her. You had no permission.
 "***
 "You did have prior convictions. You do have two prior misdemeanor assaults, conviction for drug paraphernalia, conviction for telecommunications harassment. You also have other convictions.
 "***
 "And you do have prior violations of sanctions. In the case from Lyndhurst, in 2003, you were found in violation."[7]
 {¶ 38} Here, the trial court sentenced Kushlan to a prison term within the statutory range of six to eighteen months. Although the trial court judge was not required to make findings or give reasons for imposing his sentence, he discussed various factors he considered when he imposed sentence. *Page 15 
 THE COURT: "You have indicated, in your PSI, that they were the aggressors. That was not what the jury believed. The evidence really shows that you came back, to a house where young girls were drinking, and you preyed upon this particular girl, touched her against her will."
 {¶ 39} We find that the trial court explained all relevant considerations under the statutes, namely, that Kushlan had a prior criminal record; prior sanction violations; indicated that Kushlan believed the girls were the initial aggressors in his PSI; and did not show genuine remorse.
 {¶ 40} The trial court concluded that:
 "This is more than the minimum, but I feel it's important, in this instance, because you do have prior offenses of violence, and also, harassment of other individuals, and, to me, this was just a continuation of that behavior, and had a serious impact upon a young person here. *** So, you have received more than the minimum. I think that's appropriate in this case because this was egregious."[8]
 {¶ 41} Accordingly, a review of the record in this case demonstrates that the trial court considered the purposes and principles of R.C. 2929.11, as well as the factors listed in R.C. 2929.12.
 {¶ 42} In addition, the trial court properly applied postrelease control and the sentence imposed was within the permissible statutory range of six to eighteen months. Accordingly, the first step underKalish was satisfied. We now consider whether the trial court abused its discretion in sentencing Kushlan.
 {¶ 43} An abuse of discretion is more than an error in judgment or law; it implies an attitude on the part of the trial court that is unreasonable, arbitrary, or *Page 16 
unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,5 Ohio B. 481, 450 N.E.2d 1140.
 {¶ 44} As previously mentioned, the record reflects that the trial court gave careful and substantial deliberation to the relevant statutory considerations. Those considerations included Kushlan's previous criminal background, sanction violations, and lack of genuine remorse as well as other factors mentioned by the trial judge. We find that the trial court did not abuse its discretion in sentencing appellant to 17 months.
 {¶ 45} Accordingly, appellant's second assignment of error is overruled.
 {¶ 46} The judgment of the trial court is affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, J., CONCURS; *Page 17 
MELODY J. STEWART, P.J., CONCURS IN JUDGMENT ONLY.
[1] Tr. 403, 468.
[2] M.S. told appellant, "no, please stop" when he used force to roll her onto her back for a better position. Tr. 403.
[3] Tr. 403.
[4] Tr. 405.
[5] Tr. 406.
[6] Tr. 407.
[7] Tr. 784-786.
[8] Tr. 789. *Page 1